IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION

**DRA TAGGART, LLC, a Pennsylvania
Limited Liability Company,**

    Plaintiff,

v.                                      Civil Action No.: 1:16-cv-1362

**MID-VOL COAL SALES, INC., a
West Virginia Corporation**

    Defendant.

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Now comes the Plaintiff, DRA TAGGART, LLC, by counsel, and pursuant to the Court's May 18, 2016 Scheduling Order, submits the following proposed Findings of Fact and Conclusions of Law on substantive theories of recovery and damages.

### FINDINGS OF FACT

1. Plaintiff DRA Taggart, LLC ("DRA Taggart")[1] is a design and construction services firm based in Canonsburg, Pennsylvania that specializes in materials handling and coal processing operations in the mining industry.

2. Defendant Mid-Vol Coal Sales, Inc. operates under the "ArcelorMittal Princeton" ("AMP") umbrella of companies that mine and process coal in and around Southern West Virginia for international steel conglomerate ArcelorMittal, S.A. Part of the AMP operation includes Prime Processing's coal preparation facility located in Eckman, West Virginia, which is commonly referred to as the "Eckman Plant."

---

[1] It is also the successor-in-interest to Forge Group North America, LLC and Taggart Global, LLC, which were the entities that actually performed portions of the work at issue in this case. For simplicity and consistency, all of these entities will be referred to as DRA Taggart for the purposes of this memorandum.

1

3. Back in 2014, Defendant hired DRA Taggart to install a "refuse press" at the Eckman Plant. Defendant agreed to pay DRA Taggart on a "cost plus" basis for its work. Per this model, DRA Taggart added its total labor, equipment, and materials costs, and then added fifteen percent of this amount to derive the total price, including overhead and profit, for the project. This work was completed and DRA Taggart was paid-in-full.

4. Around the time the refuse press project was wrapping up, Defendant desired to have a "clean coal press" installed at the Eckman Plant. Essentially, a clean coal press allows a coal preparation plant to dewater, or "press", smaller particles of coal that would otherwise be discharged as refuse, thereby improving the recovery rate and overall plant efficiency.

5. DRA Taggart was selected as the contractor because they were already mobilized onsite. This fact resulted in significant cost savings to the Defendant.

6. Just like the refuse press, work on the clean coal press was to be based on the "cost plus fifteen percent" model.

7. Mid Vol specifically directed Plaintiff to track its costs in this manner. Defendant opened an initial Purchase Order to bill to, and that amount of that Purchase Order was going to be increased as the project progressed.

8. Neither party would have agreed to work on this project on a set bid amount because of the extreme uncertainties that come with installing an untested piece of equipment in the harsh environment of a coal preparation plant.

9. Zachary Kitts served as AMP's Project Engineer for the clean coal press project and would interact with DRA Taggart Project Manager Troy Huffman on a daily basis. During the course of construction, several changes and improvements were made. Plant Superintendent John Kennedy would tell Mr. Kitts what needed to be done. Mr. Kitts and Mr. Huffman would meet on a bi-weekly basis to discuss "where they [DRA Taggart] stood."

10. Mr. Huffman would then print a copy of the spreadsheet and provide it to Mr. Kitts, who would then in turn submit it to AMP COO Sam Crabtree. In addition to the related

work, Mr. Kennedy would also direct DRA Taggart to perform work not directly related to the Clean Coal Press.  However, regardless of whether the work was related to the clean coal press or not, Mr. Kennedy still understood that DRA Taggart would be compensated for this work as well on the same cost plus fifteen percent basis.

11. Mr. Huffman would also provide invoices to Mr. Kitts with all supporting documentation.  Mr. Kitts was extremely thorough and would go through the invoice with Mr. Huffman.  In the event an error was discovered, or Mr. Kitts took issue with a particular cost, the invoice could be prepared with the appropriate change. At the conclusion of the meeting, Mr. Huffman would provide Mr. Kitts will all supporting backup documentation, and Kitts would retain the documents. .

12. By the time Mr. Kitts reviewed the invoice and received supporting documentation, Mid Vol would have in its possession all the backing documents to support any charge.

13. This approval happened contemporaneous with the work.  Mid Vol approved it at the time, but now seeks to avoid its payment obligations by feigning ignorance on specific costs.

14. At no point in time did Mr. Kitts ever tell Mr. Huffman that AMP would not pay for work performed or that a particular item cost too much, nor did they make a distinction between the clean coal press work and the other extra items in terms of how payment would be handled. Plaintiff reasonably relied upon the directives of Defendant's senior management to believe the work was authorized and Plaintiff would receive payment.

15. DRA Taggart prepared a summary list of all the extra work performed, bringing the total cost from the budgeted $4,535,839.00 to the final cost of $5,555,581.51.

16. Mr. Kitts directed DRA Taggart to perform each extra work item, that he understood each item would result in additional costs incurred, and that the cost for each item would be the same cost-plus fifteen percent model.

17. For the items "Concrete", "Manlift", "Net Positive/Negative Variance on Original Scope", and "Freight", Mr. Kitts testified that he was not sure how those figures were calculated, but testified that DRA Taggart provided backup documents at the time costs were incurred, and acknowledged that it would be possible to look at DRA Taggart's records to confirm what was owed for each item.

18. Defendant was also provided with the final "MAPS" budget for the project which clearly lists each item of costs.

19. As of October 15, 2014, Defendant fell behind on payments to DRA Taggart. During an October 15, 2104 meeting with DRA Taggart management, Mr. Kitts, and AMP CFO Barry Tackett, DRA Taggart and Defendant negotiated a modification in payment terms on outstanding invoices.

20. Defendant agreed to pay approximately $1.8 million dollars in monthly installments by February 25, 2015. Another meeting was to be set to discuss final payments in November or December.

21. During this time frame, the arrangement was that DRA Taggart would be paid-in-full and at no point during these negotiations did AMP allege the work was not authorized. Defendant also never questioned the amount of any of Plaintiff's submissions during the period of renegotiations.

22. In May 2015, AMP CEO Gregory Jessee left the company and was replaced by current AMP CEO Jennifer Austin. When Ms. Austin came to AMP, she asked Mr. Kitts what was still owed on the project and told Mr. Kitts it was over budget. Mr. Kitts responded that "Well, you know, the work has been done, so, at the discretion of John Kennedy, it's owed."

23. In a June 3, 2015 email from Mr. Kitts to Ms. Austin, he writes:

Total spent with DRA Taggart on J4679 (Clean Coal Press) is $5,555,581.51. We still owe $1,240,728.39. Minus the wall ($152,975.56) we owe $1,087,752.83.

4

24.     Prior to Mr. Kitts June 3 email, AMP made its last payment to DRA Taggart in the amount of $253,520.89 on May 29, 2015. Consistent with DRA Taggart invoice and payment records, Mr. Kitts email reflects the following debt:

| Amount owed per Mr. Kitts | $1,240,728.39 |
| Last payment by AMP on 5/29/15 | -$253,520.89 |
| **Total Still Owed** | **$987,208** |

25.     To date, no additional payments have been made by Defendant and the amount still owed is $987,208.

## CONCLUSIONS OF LAW

25.     There is no written contract governing the work on the clean coal press; however, the evidence clearly shows an express oral agreement between the parties that is enforceable. Under West Virginia law, "[t]he distinction between an express and implied contract is that when there is an actual promise, a contract is said to be express; when there is no actual promise, a contract is said to be implied." *Case v. Shepherd*, 140 W. Va. 305, 310, 84 S.E.2d 140, 143 (1954). "The distinction involves no difference in legal effect, but lies merely in the mode of manifesting assent, or rests in the mode of proof . . . [t]he nature of the understanding is the same, and both express contracts and contracts implied in fact are founded on the mutual agreement of the parties and require a meeting of the minds." *Id.* While express contracts are proven by writings or parol evidence, implied contracts are proven by "inference or deduction." *Id.* Regardless of whether the agreement in this case is considered express or implied, Defendants have breached an enforceable contract.

26.     Project Engineer Zachary Kitts and Plant Superintendent John Kennedy both confirm the existence of a "cost-plus fifteen percent" agreement between DRA Taggart and Defendant. Additionally, they requested DRA Taggart to perform additional work and that they knew at the time the work was requested that this work would require additional compensation consistent with the agreements original payment terms for the clean coal press projedt.

27. This evidence alone creates the meeting-of-the-minds necessary to form a binding express contract between the parties. Regardless of whether the work was directly related to the clean coal press installation, or ancillary work requested by Mid-Vol management, the work was performed per the agreement. Defendant has breached this agreement by failing to pay for the work requested by Mr. Kitts and Mr. Kennedy and performed by DRA Taggart.

28. Even if the Court determines for some reason that an express contract did not exist, the evidence unquestionably shows the existence of an implied promise to pay.

> Where service is performed by one at the instance and request of another, and especially where that other is personally benefited by the service, the law implies a contract, that the party, who performs the service, shall be paid a reasonable compensation therefore, unless there be something in the relation of the parties or the circumstances of the case, which precludes the idea of such compensation; in which case there would be an implied agreement or understanding, that no such compensation was to be paid.

*In re Estate of Thacker,* 152 W. Va. 455, 463-464, 164 S.E.2d 301, 307(1968), citing Syl. Pt. 4, *Hurst's Adm'r v. Hite, Adm'r*, 20 W. Va. 183 (1882).

29. There are really three classifications of invoices that are still outstanding:

   a. The first classification is for work that was within the original scope that caused the amount to exceed the original project estimate. This money is clearly subject to the "cost plus fifteen percent" payment model. This was never a set bid amount. This project was always contemplated as an "increase as we go" purchase order to account.

   b. The second classification is for extra work that was related to the clean coal press installation that was not within the original scope. All of this work was requested by Defendant. This work is clearly subject to the expresses oral contract that required payment on a "cost plus fifteen percent" basis.

   c. The third classifications was extra work that was not related to the clean coal press, but was nonetheless requested by Defendant's management to avoid shut downs or regulatory issues. Some of this work was not even at the preparation

6

plant, but on other parts of Defendants property. The evidence will show that all the parties contemplated that this work would be at the "cost plus fifteen percent" basis. However, Defendant acknowledged in its written submissions that this work may not be subject to the "cost-plus fifteen percent model." Instead, Defendant argues that this work is subject to a quantum meruit analysis. If that is true, Plaintiff is entitled to the full market value of the work had it been requested by a third-party

30. There is no dispute that Defendant requested DRA Taggart to perform additional services at the Eckman Plant while its crews were installing the clean coal press. This work provided a benefit to Defendant, and the Defendant's management knew at the time that the work would require additional compensation. Whether or not this work was within the scope of the original press project is irrelevant for DRA Taggart should be fairly paid for this work. DRA Taggart relied in good faith on Defendant's conduct with the refuse press to assume it would be paid for the work. Similarly, DRA Taggart relied on the apparent authority of Zachary Kitts, John Kennedy, and other management employees within the AMP umbrella to authorize DRA Taggart to perform as requested. This reliance was reasonable considering the exact same procedure occurred on the refuse press project, and that project was paid in full. At no point did anyone at AMP direct DRA Taggart to cease work, or advise that the costs of the extra work were too high. Finally, even during renegotiations for past due invoices, Defendant represented that payment would be made. Defendants conduct related to this work proves the existence of an implied contract for which DRA Taggart must be reasonably compensated.

31. Both DRA Taggart's accounting records for the project, and Mr. Kitts own reporting to Jennifer Austin point to the exact same outstanding amount: **$987,208.** There is no dispute as to the amount owed, and therefore any judgment rendered in this matter as a matter of law can be made in a sum certain of $987,208.

32. In a diversity case such as this, state law governs whether prejudgment interest applies. *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999). Under West Virginia law, the jury, in any action founded on contract, may allow interest on the principal due, or any part thereof, and in all cases they shall find the aggregate of principal and interest due at the time of the trial, after allowing all proper credits, payments and sets-off; and judgment shall be entered for such aggregate with interest from the date of the verdict. *W. Va. Code § 56-6-27*; see also *Board of Educ. v. Zando, Martin & Milstead, Inc.*, 182 W. Va. 597, 390 S.E.2d 796 (1990)(prejudgment interest as an award of interest in a contract action is allowable in any action founded on contract). Any award of prejudgment interest is simple, not compound. *Hensley v. West Virginia Dep't of Health & Human Resources*, 203 W. Va. 456, 508 S.E.2d 616 (W. Va. 1998). Interest begins to accrue "from the due date until paid." *Morton v. Godfrey L. Cabot, Inc.*, 134 W. Va. 55, 63 S.E.2d 861 (1949).

33. As of the date of Defendant's last payment (May 29, 2015), the outstanding invoices were past due. Therefore, based on the West Virginia Supreme Court's official interest rate in 2016 of seven percent (7%), and applying this rate to the $987,208 owed for 644 days[2], DRA Taggart is entitled to $125,713.51 in simple interest.[3] DRA Taggart should be entitled to this interest considering Defendant's own Project Engineer stated that this money was "owed" as of May 2015, but never paid.

34. This is a simple case of payment owed for work performed. There is no genuine issue of material fact necessary for the fact-finder to consider as AMP's own management testified that the work was performed as directed, and the payment was to be made under the previously agreed terms. Likewise, there is no dispute as to the amount still owed. Therefore, this Court should grant Plaintiff judgment as a matter of law in the amount of at least

---

[2] 664 days is the amount of days between May 29, 2015 and the projected final date of trial.
[3] Additionally, DRA Taggart submitted these invoices well before. At trial, DRA Taggart reserves the right to seek interest on each individual invoice from the date it was due.

$1,112,921.51, plus any additional fees, costs, or amounts that this Court deems appropriate, plus post-judgment interest.

**DRA TAGGART, LLC**
By Counsel,

/s/ Keith R. Hoover
Christopher A. Brumley (WV Bar # 7697)
Keith R. Hoover (WV Bar #11099)
FLAHERTY SENSABAUGH BONASSO PLLC
Post Office Box 3843
Charleston, West Virginia 25338-3843
Phone: (304) 345-0200
Fax: (304) 345-0260
cbrumley@flahertylegal.com
Khoover@flahertylegal.com

IN THE UNITES STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

DRA TAGGART, LLC, a Pennsylvania
Limited Liability Company,

    Plaintiff,

v.                                      Civil Action No.: 1:16-1362

MID-VOL COAL SALES, INC., a
West Virginia Corporation

    Defendant.

## CERTIFICATE OF SERVICE

I, Keith R. Hoover, hereby certify that on this 16th day of March, 2016, a true and correct copy of the foregoing "**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**" was served via electronic mail to the following counsel of record:

Erin Magee, Esquire
Jonathon L. Anderson, Esquire
Evan Kime, Esquire
Jackson Kelly, PLLC
500 Lee Street East, Suite 1600
Charleston, WV 25302
*Counsel for Defendant*

                                                /s/ Keith R. Hoover
                                                Keith R. Hoover (WV Bar #11099)